UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No.: 4:14-cr-367 JAR |
| | ) |
| ABSALOM CARLISLE, | ) |
| | ) |
| Defendant. | ) |

**SENTENCING MEMORANDUM**

COMES NOW Defendant, Absalom Carlisle ("Carlisle"), by and through counsel, and files the following memorandum for sentencing:

**I. Procedural Background**

On September 3, 2015, the government filed a one-count Information alleging Carlisle obstructed passage of the United States Mail. See Doc. Text #55. On September 4, 2015, Carlisle pled guilty to the Information, see Doc. Text #57, and did so in connection with a written agreement. See Doc. Text #58. Pursuant to this agreement, the government will recommend a sentence of not more than 80 days in jail and Carlisle will recommend a sentence of probation. The statute of conviction provides for a 0 to 6-month range of punishment and up to five years of probation. See 18 U.S.C. § 1701. For the reasons below, Carlisle requests a sentence of probation with a 100 hour community service component.

**II. Carlisle's History and Characteristics**

Carlisle was born to parents he never met in an unknown city in Kenya on August 23,

1

1974.  To conceal his status as illegitimate[1], his grandparents raised him as their own in an impoverished, agrarian community.  Carlisle did not learn their true identities until he reached 12 or 13 years of age.

About five years later, two missionaries from the United States adopted Carlisle, who they first met nine years earlier.  Carlisle was 18 at the time of the adoption.  At age 22, the three permanently relocated to the States and formalized Carlisle's adoption under United States law.

Shortly after his arrival, Carlisle enrolled as a part-time student at a community college near his new home in Lexington, Kentucky.  He enrolled in courses at a nearby college about two years later and completed 24 credit hours at the two institutions combined, then transferred to the University of Kentucky.  By 2001, Carlisle had earned 131 credit hours of course work, but had not earned a degree.  Ten years later, he earned a B.S. in managerial economics from Washington University in St. Louis.  At the time, Carlisle rented a small apartment and worked several jobs related to his field of study.  Among others, A.G. Edwards, Bank of America, and J.P. Morgan either employed him or offered him an internship.

Carlisle's adoptive family is small; it consists of his parents.  He has no adoptive brothers or sisters.  His father, Michael ("Michael"), is a 68 year-old, retired Episcopal priest.  Doris ("Doris"), his mother, is a retired school teacher.  Both suffer from maladies common to the aging, like high blood pressure, diabetes, and arthritis.  Michael is also prostate cancer survivor, who is technically still in recovery.

Michael and Doris married more than 40 years ago.  Carlisle married two months ago to a

---

[1] At the time, Carlisle's culture imposed various sanctions on "illegitimate" children, some of which led invariably to death.

woman he has known for more than ten years. The two wed in Birmingham, Alabama and hope to have a marriage as meaningful and lasting as Carlisle's parents'.

Carlisle has no substance abuse history. He has no criminal history either, and is a true "first-offender" within the meaning given to the term by the United States Sentencing Commission[2].

In short, save the instant offense, Carlisle has led a remarkable, pro-social life made possible through self-determination and parental love and characterized by decency to others, as the letters submitted to this Court suggest.

### III. The Nature and Circumstances of the Offense

In 2008, Carlisle gave notice of his intent to move from his St. Louis apartment following his layoff from J.P. Morgan, a result of the then-widening global economic crisis. Carlisle had lived in the apartment for about 3 years by then and had grown friendly with his landlord, Phyllis Smith ("Smith"). At the time, Smith needed someone to help manage her mother's in-home care and offered Carlisle the opportunity, despite his lack of experience. Carlisle accepted the offer and thus remained in his apartment while he continued to attend school part-time. Over the next several months, Carlisle managed the daily needs of Smith's mother. He made certain she ate regularly, took her medications as directed, and kept her appointments, medical and otherwise. He set the schedules of her professional in-home health care providers as well, a matter that had

---

[2] The term "first offender" includes offenders with one or more prior arrests, but excludes offenders with one or more prior convictions. See <u>Recidivism and The "First Offender": A Component of the Fifteen Year Report on the United States Sentencing Commission's Legislative Mandate</u>, Introduction (May 2004). Most Criminal History Category I offenders have one or more prior convictions and are not true first-offenders. See <u>id</u>. at 17. Carlisle has no prior convictions or arrests. See <u>PSR</u> at ¶¶ 22-27.

grown increasingly difficult for Smith to juggle.

Smith's mother passed away eight months later. About three weeks after, Carlisle received a call from James Hurwitz ("James"), an out-of-town friend of Smith's whose elderly father lived in St. Louis. Smith recommended Carlisle to James, and James asked Carlisle if he could assist his father, Robert Hurwitz ("Hurwitz"), as he had assisted Smith's mother. Unemployed in a shrinking job market, Carlisle accepted the offer.

At the outset, Carlisle cared for Hurwitz with the help of Hurwitz's housekeeper. He drove Hurwitz to his appointments and on drives around town, took him to his masseuse and restaurants, got him to bed on occasion, made sure he took his medications, and watched over him generally. The job proved more difficult than Carlisle expected though and, within three months, he hired several others to assist with Hurwitz's round-the-clock care.

Hurwitz did not personally pay Carlisle for his services. James paid for them on Hurwitz's behalf with Hurwtiz's funds. Typically, Carlisle would send James an email listing the out-of-pocket expenses he incurred for incidentals, and James would transfer reimbursement to Carlisle at the end of each month, along with the fee for his services. Carlisle paid his assistants from the same funds and, for the most part, this system worked well, though the cost of monthly incidentals coupled with the wait for reimbursement often left Carlisle without sufficient funds towards the end of the month.

To improve his monthly cash flow, Carlisle added his name to Hurwitz's American-Express accounts and ordered supplemental cards to pay for expenses he had previously paid out-of-pocket. Carlisle did not discuss this matter with Hurwitz, however. He did not discuss it with James either. In short, he had no authorization to do as he did. To make matters worse, he made

4

unauthorized personal purchases totaling more than $20,000 by the time Hurwitz passed away in March of 2013.

Two months later, Hurwitz's estate contacted Carlisle about Hurwitz's outstanding American Express balance. Carlisle did not hire an attorney or deny his wrongdoing. Rather, he admitted he obtained the cards without authorization and sometimes used them for personal purchases. Carlisle signed an agreement with the estate to repay the outstanding balance in full.

About 18 months later, two United States Postal Inspection Service agents contacted Carlisle and asked if he would meet with them at their office. Again, Carlisle did not hire an attorney or attempt to deny his wrongdoing. Instead, he met with them two days later and admitted his misconduct, just as he had done 18 months earlier. The government filed its indictment six days later.

The loss amount Carlisle caused is not easy to fix. The Hurwitz estate calculated it at $20,070.62. The government subsequently calculated it in amounts from $30,00 to $50,000. Records from American Express do not shed much light on the matter, as they only identify the date of each transaction and the business at which it was made. Thus, the records might identify a meal or massage, but do not indicate if the meal or massage was for Hurwitz, Carlisle, or both. As a result, and in exchange for the reduced charge to which Carlisle pled guilty, Carlisle and his family agreed to repay more than any restitution amount Carlisle might owe, including more than $26,000 in legal fees incurred by the Hurwitz estate, which the relevant statutes would otherwise exclude from restitution.

### IV.  The Purposes of Sentencing

The purposes of sentencing do not support a custodial sentence.

5

### A.  Just Punishment

The facts of the instant case are atypical, but the recommended outcome is not.  In fact, it is entirely consistent with the sentences imposed on similar offenders convicted of similar offenses with similar and even greater loss amounts.  For example, in <u>United States v. Dennis French,</u> 3:14-cr-30106-NJR (S.D. IL 2014), the court imposed a sentence of three years probation on an offender who embezzled more than $80,000 from the United States Railroad Retirement Board over the course of 18 months.  In <u>United States v. Carrie Oyarzabal</u>, 4:14-cr-166 ERW (E.D. MO 2014), the court imposed a sentence of five years probation with six months of home confinement on an offender who, over six years, misappropriated more than $80,000 from her employer.  In <u>United States v. Douglas Dalton</u>, 4:12-cr-246 RWS (E.D. MO 2012), the court imposed a sentence of one-day time served with four months of home confinement and 40 hours of community service on an offender who committed a two-year bank fraud in an amount in excess of $155,000.  In <u>United Stated v. Shamika Coleman</u>, 3:10-cr-30123 WDS (S.D. IL 2010), the court imposed a sentence of five years probation and six months of home confinement on an offender who, over two and one-half years, defrauded the government of more than $30,000.  Similarly, in  <u>United States v. Willita Burnett</u>, 4:09-cr-292 HEA (E.D. MO 2009), the court imposed a sentence of three years probation on an offender who used her position as a doctor's office receptionist to obtain patient credit card numbers which she used over two years to purchase more than $60,000 in goods[3], and, in <u>United States v. Jerry Coffee</u>, 4:09-cr-279 ERW (E.D. MO 2009), the court imposed a sentence of three years probation on an offender who, over

---

[3] Notably, the government could have pursued a slew of aggravated identity theft charges against Burnett, since she used each credit card without authorization and knew they belonged to actual persons.

6

five years, took more than $160,000 in disability benefits to which he was not entitled.  Likewise, in United States v. Edna Latimore, 4:08-cr-483 CAS (E.D. MO 2008) the court imposed a sentence of three years probation on an offender who stole more than $75,000 over three years from a local labor union through her position as its treasurer.  Like Carlisle, each of these offenders fell into criminal history category I and none of them earned a government-sponsored sentence reduction.  In contrast to Carlisle, none of them paid full restitution and more either at or prior to sentencing and each of them, save perhaps Coleman, caused an actual loss greater than that caused by Carlisle.

      Of course, had Carlisle pled guilty to every count charged in the original indictment his sentence would have climbed to around 39-45 months.  But the same is true for Burnett, who the government could have charged with multiple counts of aggravated identity theft based on her unauthorized use of at least ten different patient credit cards.  Moreover, the facts here are most akin to standard mail and wire fraud offenses ordinarily punishable under U.S.S.G. § 2B1.1, just as in the above-cited cases, each of which, as noted, resulted in a probationary or one-day time-served outcome.  Accordingly, just punishment, as measured by the sentences imposed on similar offenders convicted of similar offenses, does not justify Carlisle's incarceration.

### B.  General Deterrence

      General deterrence does not justify Carlisle's imprisonment either.  No credible evidence suggests increases in sentence severity reduce crime through general deterrence.  See e.g., Cheryl Marie Webster and Anthony N. Doob, Searching for Sasquatch: Deterrence of Crime through Sentence Severity, The Oxford Handbook of Sentencing and Corrections, p. 174-175, Oxford University Press (2012) ("Despite enormous research efforts, no credible consistent body of

evidence has been found to support the conclusion that harsher sentences (within ranges conceivable in Western democracies) achieve marginal deterrent effects on crime.");Valerie Wright, Ph.D., Research Analyst, The Sentencing Project, <u>Deterrence in Criminal Justice: Evaluating Certainty Versus Severity of Punishment</u> at 9 (2010) ("Existing evidence does not support any significant public safety benefit of the practice of increasing the severity of sentences by imposing longer prison terms. In fact, research findings imply that increasingly lengthy prison terms are counterproductive.");  Anthony N. Doob, Cheryl Marie Webster and Rosemary Gartner, <u>Issues Related to Harsh Sentences and Mandatory Minimum Sentences:  General Deterrence and Incapacitation</u>, at A-3, University of Toronto, Centre for Criminology & Social Studies, (2014) ("At this point, we think it fair to say that we know of no reputable criminologist who has looked carefully at the overall body of research literature on 'deterrence through sentencing' who believes that crime rates will be reduced, through deterrence, by raising the severity of sentences handed down in criminal courts."); Michael Tonry, <u>Learning from the Limitations of Deterrence Research</u>, Chicago Journals, Crime and Justice, Vol. 37, No. 1, University of Chicago Press (2008), pp 301-302 ("It is unclear to me which is more surprising: that so little credible evidence exists that criminal behavior is much affected by changes in punishment policies or that policy makers continue to believe that policy changes significantly affect behavior and that research continues to test for their crime-preventive effects.")

"Three National Academy of Science panels, all appointed by Republican presidents, [have] reached [this] conclusion, as has every major survey of the evidence."  Michael Tonry, <u>Purposes and Functions of Sentencing, 34 Crime and Justice</u>: A Review of Research 28-29 (2006).

Research abroad has done the same. See e.g., Andrew Von Hirsch, et. al., Cambridge University, Criminal Deterrence and Sentence Severity: An Analysis of Recent Research (1999) (finding no data to support a statistically significant correlation between increases in sentence severity and crime rate reductions); see also David Farrington, et al., Changes in Crime and Punishment in America, England, and Sweden between the 1980s and the 1990s, Studies in Crime Prevention, 3:104-131 (1994) (comparing crime and punishment trends in the United States, England, and Sweden and failing to detect any decrease in crime rates as a result of increases in sentence severity).

Moreover, government data support these conclusions as to economic offenses in particular. For example, in 2002, Congress raised the maximum penalties for mail and wire fraud from 5 years to 20. See Go Directly to Jail: White Collar Sentencing After the Sarbanes-Oaxley Act, 122 Harv. L. Rev. 1728, 1735 (2009) [hereinafter Go Directly to Jail]. Similarly, in 2001, the Commission substantially increased § 2B1.1's penalties, see United States Sentencing Commission, United States Sentencing Guidelines Manual, Appendix C, Amendment 617 (2001), and did so again in 2003. See United States Sentencing Commission, United States Sentencing Guidelines Manual, Appendix C, Amendment 653 (2003). Yet, in this same time, the incidence of economic offenses increased substantially. In fact, between 2003 and 2007, § 2B1.1 sentencings rose from 6,154 to 8,777, see Go Directly to Jail: White Collar Sentencing After the Sarbanes-Oaxley Act, 122 Harv. L. Rev. 1728, 1735 (2009) [hereinafter Go Directly to Jail], and fraud reports increased from 3,515 to 68,816. See Daniel Dooley & Mark Radke, Does Severe Punishment Deter Financial Crimes, 4 Charleston L. Rev. 619, 637 (2010) [hereinafter Does Severe Punishment Deter]. These outcomes do not comport with the predictions of general

9

deterrence, but run counter to them instead.  As one critic noted, "[t]hese numbers suggest that, whatever the increased sentences are doing, they are not deterring the kind of criminal activity that [Congress and the Commission hoped] to prevent."  <u>Go Directly to Jail</u> at 1735.

### C.  Incapacitation

Incapacitation justifies Carlisle's's imprisonment no better.  Carlsile's criminal history category I status reflects his reduced re-offense risk relative to similarly situated offenders in all other criminal history categories.  <u>See</u> United States Sentencing Commission, <u>Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines</u>, pp. 28-30 (May 2004).  But his re-offense risk is lower than most criminal history category I offenders, as well.  Carlisle's is a 41 year-old married male with a college education, a steady history of work, and no history of substance abuse.  <u>See</u> <u>Presentence Investigation Report</u> at ¶¶ 28, 36, 42, 49-52.  According to the Commission, these variables correlate with reduced re-offense rates, <u>see</u> United States Sentencing Commission, <u>Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines</u>, pp. 28-30 (May 2004) (noting older offenders are less likely to re-offend than younger offenders, married offenders are less likely to re-offend than unmarried offenders, offenders with more education are less likely to re-offend than offenders with less education, offenders employed in the year prior to their offense are less likely to re-offend than offenders without such employment, and offenders with no history of substance of abuse are less likely to re-offend than offenders with substance abuse histories) and distinguish Carlisle as substantially less likely to re-offend than most of his criminal history category I counterparts.

See id. Carlisle's status as a true "first-offender"[4] distinguishes him in the same way. See Recidivism and The "First Offender": A Component of the Fifteen Year Report on the United States Sentencing Commission's Legislative Mandate at 17 (May 2004). In fact, according to the Commission, true first-offenders are among the "federal offenders who are the least likely to reoffend." Id.

### V. Conclusion

Carlisle is a 41 year-old married male who has lived a life devoid of criminality. He acknowledged his guilt for the offense and agreed in writing to make full restitution to the victim's estate some 18 months prior to law enforcement's involvement in the case. Statistically, he is exceedingly unlikely to ever re-offend, and no credible evidence suggests his incarceration will deter others from committing similar offenses more effectively than will a sentence of probation. Moreover, similar offenders convicted of similar offenses with similar and even greater loss amounts have received probation and one-day time served sentences in this and other jurisdictions, though, unlike Carlisle, they did not make full payment of restitution and more either prior to or at the time of sentencing. In addition, like his parents, Carlisle has tried to lead a life of giving to others, as the letters submitted to this Court suggest. Thus, in the 41 years of life he has led to date, the instant case constitutes an aberration, not a consistent theme. These and other facts strongly suggest that Carlisle is the sort of "non-violent, low-level" offender for

---

[4] The term "first offender" includes offenders with one or more prior arrests. It excludes offenders with one or more prior convictions. See Recidivism and The "First Offender": A Component of the Fifteen Year Report on the United States Sentencing Commission's Legislative Mandate, Introduction (May 2004). Most Criminal History Category I offenders have one or more prior convictions and are not true first-offenders. See id. at 17. French has no prior convictions or arrests.

whom "prison may not be the most sensible method of punishment." Eric Holder, <u>United States Attorney General Announces "Smart on Crime" Initiatives,</u> United States Department of Justice (August 12, 2013). For these reasons and others noted within this memorandum, a sentence of probation with a 100-hour community service component will better serve the purposes of sentencing, the mandate of 18 U.S.C. §3553(a), and the individualized form of sentencing envisioned by <u>Booker</u> than will any other sentence available to this Court.

        Respectfully submitted,

        ROSENBLUM, SCHWARTZ, ROGERS & GLASS, PC

By:   /S/ Adam Fein
       ADAM FEIN, #52255 MO
       Attorney for Defendant
       120 S. Central Avenue, Suite 130
       Clayton, Missouri 63105
       (314) 862-4332/Facsimile (314)862-8050

**CERTIFICATE OF SERVICE**

    I hereby certify that on December 18, 2015 the foregoing was electronically filed with the Clerk of the Court to be served by operation of the Court's electronic filing system upon Mr. Reginald Harris, assistant United States attorney.